IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-00120-MEH-CBS

RIKKI LAMBERT,

    Plaintiff,

v.

TRAVEL CENTERS OF AMERICA,

    Defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Michael E. Hegarty, United States Magistrate Judge**.

Pending before the Court is Defendant's Motion for Summary Judgment [filed September 15, 2009; docket #47]. By Order of Reference to United States Magistrate Judge, the case has been referred to me for disposition upon the consent of the parties pursuant to 28 U.S.C. § 636(c). Docket #21. The matters are fully briefed, and oral argument will not materially assist the Court in the adjudication of the motion. For the reasons stated herein, the Court **grants in part and denies in part** Defendant's Motion for Summary Judgment.

### BACKGROUND

**I.    Findings of Fact**

Based upon the written record, the Court finds the following facts:

1.    The Plaintiff, Rikki Lambert, was hired by the Defendant, Travel Centers of America ("TA"), in or about February 2007 as a Technician (mechanic) at TA's "Denver East" location. Deposition of Rikki Lambert, May 18, 2009 ("Lambert depo") at 24: 2-20, docket #48-4 at 3.

2.    In the summer of 2007, Tony Bashkar came to the Denver East location to serve as its General Manager. Lambert depo at 73: 22-25, 74: 1-2.

3.  In or about November 2007, Matt Johnson came to the Denver East location to serve as an Assistant General Manager. Deposition of Matthew Johnson, April 1, 2009 ("Johnson depo") at 30: 9-14, docket #48-7 at 3. Mr. Johnson was Ms. Lambert's immediate supervisor (according to work shift hours) until her eventual employment termination. *Id.* at 31: 23-25, 32: 1-9.

4.  In the garage where Ms. Lambert worked as a Technician, the customers were primarily diesel truck drivers who would drive the trucks into the garage bays, then describe to the Technicians the problem with the truck. Lambert depo at 62: 4-17. Although they were not supposed to be present in the garage area, the truck drivers would commonly stay and watch the Technicians do the work. *Id.*

5.  According to Mr. Johnson, the truck drivers are "not the nicest people in the world ... they come at you very angry and they're very rude, untactful ... ." Johnson depo at 58: 10-14. In describing their "normal" demeanor, Mr. Johnson testified that truck drivers "lose their temper rather quickly when things don't go exactly their way" and "can be extremely abrasive and rude." *Id.* at 64: 16-19.

6.  Ms. Lambert also testified that the truck drivers are "pretty mean" and "pretty mouthy." Lambert depo at 62: 18-21. When dealing with truck drivers in the garage, Ms. Lambert would "stand up for [her]self and not let them walk all over [her] . . . get a little mouthy back." *Id.* at 62: 22-25, 63: 1-2. She testified that it was the same with all mechanics and that the drivers never complained about such conduct. *Id.* at 63: 3-13.

7.  In January 2008, Ms. Lambert informed Mr. Bashkar that she was pregnant and could not work with or near the chemicals used in the garage. Lambert depo at 75: 5-25, 76: 1-10. Consequently, she asked for a transfer to the customer service position, known as a Truck Service Advisor ("TSA"), which was located in the store area of the shop. *Id.* at 78: 10-13.

8. On or about January 23, 2008, Mr. Bashkar transferred Ms. Lambert to a TSA position. Lambert depo at 77: 21-25, 78: 1-9. She worked primarily with another TSA, Bettie Harlow, who trained her on the job. *Id.* at 91: 20-25, 92:1 (docket #48-4); 93: 16-25, 94: 1-12 (docket #54-3).

9. As a TSA, Ms. Lambert was tasked primarily with stocking the showroom floor with oils, additives, and other products, keeping the store clean, controlling the cash drawer, writing up work orders, paying out work orders and providing customer service. Johnson depo at 51: 13-21.

10. Ms. Lambert found it difficult to switch from the Technician position, at which it was acceptable to "stand up" to rude or abrasive truck drivers, to the TSA position, at which she was required to treat the truck drivers politely. Lambert depo at 115: 22-25, 116: 1-25.

11. Ms. Lambert testified that, during her one-month tenure as a TSA, she lost her temper with customers approximately three or four times. Lambert depo at 115: 15-18. Ms. Lambert describes losing her temper as "raising my voice, you know, telling them to be patient. Hold on. I'm trying my hardest here. And I would say that kind of in a rude voice." *Id.* at 115: 12-14. In addition, Ms. Lambert admits that, although she tried not to curse, "it may have slipped out a few times." *Id.* at 113: 3-4.

12. During the instances when she lost her temper with customers, Ms. Lambert admits that she did not perform the customer service part of her job as a TSA satisfactorily. Lambert depo at 113: 11-16.

13. In addition, Ms. Lambert "whined to anyone who would listen" about not wanting to stock the shelves and clean the counter. Lambert depo at 86: 17-25, 87: 1-3; 104: 4-13. At some point, Ms. Lambert realized that stocking and cleaning were part of everyone's responsibilities, including hers. *Id.* at 104: 14-22.

14.     Mr. Johnson described the cleaning aspect of the TSA position as something he "didn't enforce." Johnson depo at 55: 19-25, 56: 1-5.

15.     Mr. Johnson relied primarily on the input of the people Ms. Lambert worked with - Bettie Harlow and Trisha Kimble - to determine whether she was doing her job. Johnson depo at 49: 5-12. He also personally observed five or six instances when Ms. Lambert lost her temper with customers, during which he stepped in to apologize and resolve the situation. *Id.* at 59: 2-24.

16.     Ms. Lambert's co-worker, Ms. Harlow, testified that she did not believe Ms. Lambert was ever at the TSA position by herself. Deposition of Bettie Harlow, May 22, 2009 ("Harlow depo"), at 19: 16-18, docket #48-12 at 3. Ms. Harlow observed one instance of a "yelling match" between Ms. Lambert and a customer. *Id.* at 21: 14-18. Ms. Harlow describes that instance as follows: "she was sitting next to me and she was eating oatmeal at the counter, and a customer asked her what she was having. And she basically told him - told him to mind his own fucking business, exact words . . . [then], she walked away from the counter." *Id.* at 21: 19-25; 22: 1-2.

17.     Ms. Lambert does not recall this instance, but testified that she would never curse at a customer who was a stranger; however, if the customer was a friend who teased her about what she was eating, she would "tell him to FO and walk away." Affidavit of Rikki Lambert, October 9, 2009 (Lambert Affidavit) at ¶ 2, docket #54-5. Ms. Lambert states that this is how she spoke with a number of her truck-driver friends and it would be taken in jest. *Id.*

18.     Ms. Harlow characterized Ms. Lambert as having a "terrible" attitude about moving from the Technician position to the TSA position, particularly due to the pay cut. Harlow depo at 20: 11-15 (docket #48-12); 25: 1-25 (docket #54-4 at 3). Ms. Harlow observed that Ms. Lambert was slow in learning the computer, even though it was "really hard." *Id.* at 26: 1-5. Ms. Harlow states that, although the first two weeks with Ms. Lambert were "hell," Ms. Lambert did "get better

4

over time" and "started to improve." *Id.* at 27: 11-16.

19.     Mr. Johnson counseled Ms. Lambert after each customer incident telling her to "take a deep breath" and "call us up front if it's really getting that bad." Johnson depo at 62: 10-25. Ms. Lambert recalls one instance, after she had worked approximately a week or two, when Mr. Johnson pulled her into a small office and told her essentially that she needed to "work on staying calm and keeping [her] cool." Lambert depo at 118: 17-23; 119: 16-23. The conversation included Mr. Johnson telling Ms. Lambert that she needed to start working on her customer service skills and seek his assistance for any problems. *Id.* at 120: 11-15.

20.     Ms. Lambert testified that, after the meeting with Mr. Johnson, she tried to seek his assistance "as often as [she] could" and "tried a lot harder to handle situations [her]self." Lambert depo at 114: 9-23; 120: 16-21.

21.     In or about February 2008, Larry Parks came to the Denver East location to replace Mr. Bashkar as the General Manager and Steve Schaefer came to serve as an additional Assistant General Manager. Johnson depo at 32: 3-9. Mr. Schaefer worked a 2:00 p.m. to 12:00 a.m shift, so he was the only manager on duty during Ms. Lambert's 4:00 p.m. to 12:00 a.m. work shifts. Deposition of Steven Michael Schaefer, May 22, 2009 ("Schaefer depo"), at 11: 19-25, 12: 1-20, docket #54-6 at 2.

22.     Mr. Schaefer had no opinion as to Ms. Lambert's ability to do her job as a TSA (Schaefer depo at 11: 1-3), but observed that she did not try hard at cleaning and stocking (*id.* at 32: 2-6) and had poor interactions with customers where she would "mouth off quite a bit, still thinking as a mechanic." *Id.* at 14: 23-25, 15: 1. He witnessed one instance when Ms. Lambert was rude to a customer that led to escalation of a tense situation: "the driver just kept on asking questions and ... her area was unorganized and she couldn't give him answers and he was in a hurry. So, ... she

got frustrated and started getting rude." *Id.* at 26: 9-17. When asked whether he wanted to have her terminated, Mr. Schaefer testified that he thought she "just needed more learning, more coaching." *Id.* at 20-24.

23. On February 24, 2008, a truck driver customer called TA's hotline to complain about service he received at the Denver East location on February 21, 2008. Defendant's Exhibit K, docket #48-13. He complained that the company's response and repairs were slow, that he paid more than $1000 in repairs, that he was stuck there all weekend, and that a "female employee named Nicki [sic] said they don't know when they will be able to jump start his truck." *Id.* Mr. Johnson was present on February 21, 2008, and testified that when the customer called for a jump start and was told he would have to wait, that was standard procedure. Johnson depo at 68: 6-22. Mr. Johnson was called to assist when the customer called another repair shop to come to TA to jump start his truck. *Id*. at 68: 23-25, 69: 1-19. The customer was very upset and claimed that "Nicki" was rude and told him he would have to wait despite the fact that he had spent a large amount of money on repairs the previous day. *Id.* at 69: 20-25, 70: 1-15.

24. Ms. Lambert testified that the General Manager, Mr. Parks, called her about the February 21, 2008 incident that same day and told her that "it sounded like ... [she] did the best that [she] could, resolved it in an appropriate manner ... and that everything should be fine." Lambert depo at 128: 10-18, docket #54-3 at 9.

25. The day after the February 24, 2008 reported complaint, Ms. Lambert was called in to meet with Mr. Parks and Mr. Johnson because "Matt [Johnson] failed to see any performance improvement on her part." Lambert depo at 137: 25, 138: 1-10; *see also* Johnson depo at 73: 22-25, 74: 1-2; Deposition of Larry Parks, May 22, 2009 ("Parks depo"), at 86: 21-25, 87: 1-7. Mr. Parks told Ms. Lambert that he was terminating her because she had too many customer complaints as a

TSA, but could come back to work as a Technician after she had her baby. *Id.* at 138: 21-25, 139: 1-4; *see also* Parks depo, at 81: 8-25 (docket #54-2), 87: 25, 88: 1-10 (docket #48-11 at 9).

26.     According to Ms. Lambert, Mr. Parks also told her that she "couldn't work there while [she] was pregnant." Lambert depo at 139: 10-14.

27.     During the termination meeting, Ms. Lambert agreed to come in the following day to finish out the work week in order to assist with her financial burden, but, instead, she left the company later that day and did not return. *Id.* at 140: 19-25. Ms. Lambert explained that she believed she did not abandon her job because "[Parks] fired me. He told me I couldn't work there anymore while I was pregnant." *Id.* at 142: 11-13.

28.     On April 2, 2008, Ms. Lambert filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), claiming that TA discriminated against her based upon her pregnancy in violation of Title VII of the Civil Rights Act of 1964, as amended, when it terminated her employment. Defendant's Exhibit N, docket #48-16 at 4-5. When Ms. Lambert met with an EEOC investigator regarding her charge, she brought with her a "summary of discrimination" that she drafted, and which reflects that Parks told her upon termination that she "can no longer work there as a TSA while [she] was pregnant." Defendant's Exhibit O, docket #48-17; Lambert depo at 175: 5-17.

29.     After the birth of her child in September 2008, Ms. Lambert returned to TA to apply for a position as a Technician, but the only position available was for a "Lube Tech." Lambert depo at 143: 14-25, 144:1. Ms. Lambert filled out an application, but Mr. Parks informed Ms. Lambert that the company was on a hiring freeze and would be hiring only employees with three or more years of experience. *Id.* at 144: 8-13. Mr. Parks testified that he did not re-hire Ms. Lambert because TA characterized her separation as job abandonment and she was automatically placed on

"no rehire" status. Parks depo at 93: 11-25.

## II.     Procedural History

This action was initiated on January 22, 2009. The Complaint alleges the Defendant violated Title VII of the Civil Rights Act of 1964, as amended, by discriminating against the Plaintiff based upon her sex (pregnancy)[1] when they terminated her employment, and by retaliating against the Plaintiff when they refused to re-hire her after she filed her EEOC charge of discrimination. Docket #1 at 3. Defendant timely answered the Complaint; however, on June 29, 2009, the Court granted Defendant's motion to amend the Answer to add an affirmative defense involving "after-acquired evidence." Docket #33. On August 3, 2009, the Court granted Plaintiff's motion to amend the Complaint, seeking to add a claim for punitive damages. Docket #42. Thereafter, the Defendant timely filed its Motion for Summary Judgment; the motion is now fully briefed and ripe for adjudication.

## DISCUSSION

Defendant's motion seeks summary judgment on all claims raised in Plaintiff's Amended Complaint: pregnancy discrimination, retaliation and punitive damages, all brought pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). The Plaintiff has challenged the Defendant's arguments regarding the pregnancy discrimination and retaliation claims, but has conceded summary judgment on her punitive damages claim. Docket #54 at 11. Therefore, Defendant's motion for summary judgment is **granted** with respect to the claim for punitive damages. The Court will proceed to analyze whether summary judgment is appropriate on the Plaintiff's pregnancy discrimination and retaliation claims.

---

[1] Pursuant to the Pregnancy Discrimination Act, the "Definitions" section of Title VII was amended by the addition of the following pertinent language: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth or related medical conditions ... ." *See* 42 U.S.C. § 2000e(k).

**I.     Standard of Review**

Summary judgment serves the purpose of testing whether a trial is required. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Id.* at 323; *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1216 (10th Cir. 2008).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. *Hysten v. Burlington Northern and Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002); Fed. R. Civ. P. 56(e). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114,

1122 (10th Cir. 2005).

The court "review[s] the evidence in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1247 (10th Cir. 2005). The non-moving party should be given the benefit of all reasonable inferences in making the genuine-issue determination. *Hysten*, 296 F.3d at 1180. The court does not weigh the evidence or make credibility determinations at the summary judgment stage. *Jones v. Barnhart*, 349 F.3d 1260, 1265 (10th Cir. 2003). The court's role is "simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Id.* at 1265-66.

**II.     Pregnancy Discrimination Claim**

A plaintiff alleging discrimination may prove her case by direct or circumstantial evidence. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). "Direct evidence" is evidence from which a factfinder may conclude, without inference, that the employment action was taken because of the employee's protected status. *Sanders v. Southwestern Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) ("[d]irect evidence is evidence which, if believed, proves the existence of a fact in issue without inference or presumption"). If a plaintiff relies on circumstantial evidence, the court uses the familiar *McDonnell-Douglas*[2] burden-shifting framework to determine whether the defendant is entitled to summary judgment. *Id.* Under such framework, the plaintiff bears the initial burden to set forth a *prima facie* case of discrimination. *Id.* If the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Thereafter, the burden shifts back to the plaintiff to show there is a genuine issue of

---

[2]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

material fact as to whether defendant was motivated by discrimination or defendant's reason is a pretext for unlawful discrimination. *Id.*

In this case, the Defendant seeks an analysis of the pregnancy discrimination claim using the *McDonnell Douglas* framework to determine whether the Plaintiff can prove the claim by circumstantial evidence. *See* docket #48 at 14. The Plaintiff does not oppose the use of such analysis. Docket #54 at 8. However, the Court finds that a *McDonnell Douglas* analysis is not necessary in this case. Through her testimony, the Plaintiff has produced direct evidence that she may have been terminated because of her pregnancy. *See* docket #54 at 6.

The Plaintiff does not dispute that, during the February 25, 2008 termination meeting, the new General Manager, Larry Parks, told her that she had problems with customer service. Deposition of Rikki Lambert, May 18, 2009 ("Lambert depo"), Defendant's Exh. C at 138: 21-25, 139: 1-4, docket #48-4 at 18. However, the Plaintiff also testified repeatedly that Mr. Parks told her at the same meeting that she "couldn't work as a TSA while [she] was pregnant." *Id.*; *see also* Lambert depo at 139: 10-14 and 140: 19-22 and 142: 11-13; EEOC summary of discrimination, Defendant's Exh. O, docket #48-17 ("[Parks] also stated I can no longer work there as a TSA while I was pregnant . . ."). If a jury believes the Plaintiff's testimony, it could conclude, without inference, that the motivating reason for her termination was her pregnancy, in light of Mr. Parks' status as a decisionmaker and the temporal proximity of the remark to the alleged discriminatory act.[3] *See Sanders*, 544 F.3d at 1105; *see also, e.g., Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 666 (7th Cir. 2006) (comments constituting direct evidence of pregnancy discrimination); *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 241 F. Supp. 2d 1123, 1138-39 (D. Kan. 2002) (same); *Green v. New Balance Athletic Shoe, Inc.*, 182 F. Supp. 2d

---

[3] In its Answer, the Defendant has pled the mixed-motive affirmative defense, which may be applicable at the trial stage.

128, 139 (D. Me. 2002) (same); *Moore v. Alabama State Univ.*, 980 F. Supp. 426, 434 (M.D. Ala. 1997) (same); *E.E.O.C. v. Freedom Adult Foster Care Corp.*, 929 F. Supp. 256, 260-61 (E.D. Mich. 1996) (same).

Even if the Court accepts the parties' invitation to undertake a *McDonnell Douglas* analysis of the Plaintiff's claim, the Court finds through such analysis there exist genuine issues of material fact as to whether the Plaintiff was terminated because of her pregnancy. To satisfy her initial burden of showing a *prima facie* case of discrimination, the Plaintiff must establish (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the TSA position, and (4) she was terminated under circumstances which give rise to an inference of unlawful discrimination. *Turner v. Public Serv. Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009); *see also Equal Employment Opportunity Comm'n v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192 (10th Cir. 2000). The parties do not dispute that the Plaintiff meets the first and second prongs; however, the Defendant contends that the Plaintiff was not qualified for the TSA position because her "tenure as a TSA was filled with customer and supervisor complaints about her behavior and performance." Docket #48 at 16.

First, it is error for a court to consider a defendant's proffered reasons for a plaintiff's discharge in evaluating a plaintiff's *prima facie* case. *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1193 ("a defendant cannot defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment action"). In addition, an employer may not defeat a plaintiff's *prima facie* case by asserting that the plaintiff failed to satisfy subjective qualifications. *Burrus v. United Tele. Co. of Kansas*, 683 F.2d 339, 341-42 (10th Cir. 1982). Therefore, because the Plaintiff submits that she was qualified for the TSA position, the Court finds that the third prong is met. *See Griffis v. City of Norman*, 232 F.3d 901, *5 n.1 (10th Cir. Oct. 17, 2000) (unpublished) ("... a plaintiff need only

present some credible evidence, including her own testimony, that she was minimally qualified to perform the position").

The Tenth Circuit has clarified that, in a termination case, the controlling factor necessary to establish the fourth prong is that the job was not eliminated after the plaintiff's discharge. *Cervantes v. Wal-Mart Stores, Inc.*, 1 F. App'x 762, *2 (10th Cir. Jan. 3, 2001) (unpublished) (citing *Perry v. Woodward*, 199 F.3d 1126, 1135-36 (10th Cir. 1999), *cert. denied*, 529 U.S. 1110 (2000)); *see also McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001). Here, there is no evidence either way as to whether the TSA position was eliminated; therefore, the Court will assume that Plaintiff has met her burden in demonstrating a *prima facie* case under *McDonnell Douglas*.

Next, the Defendant has articulated a legitimate, nondiscriminatory reason for terminating the plaintiff's employment: "by Lambert's own admission, she provided poor customer service, she had a negative attitude, and she whined (to anyone who would listen) about performing her job duties." Docket #48 at 17.

The Plaintiff must meet her ultimate burden of establishing a genuine issue of material fact by demonstrating the proffered reason is not the true reason either directly by showing a discriminatory reason more likely motivated the employer or indirectly by challenging the employer's reason as unworthy of credence and a pretext for sex discrimination. *See McCowan*, 273 F.3d at 922. "When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, [the Tenth Circuit] has held that the plaintiff must demonstrate a nexus exists between [the] allegedly discriminatory statements and the decision to terminate her." *Perry*, 199 F.3d at 1134. Otherwise, "[p]retext may be demonstrated by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morales v. McKesson Health Solutions, LLC*, 136 F. App'x 115, 118 (10th Cir. 2005) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

Here, the Court has already found that the Plaintiff has proffered direct evidence of discrimination in this case. The General Manager's statement that Plaintiff "couldn't work there while [she] was pregnant," if true, is directly tied to the Plaintiff's termination. Thus, the Plaintiff has demonstrated a genuine issue of material fact as to whether she was terminated because of her pregnancy.

In addition, giving the Plaintiff the benefit of all reasonable inferences, the Court finds the Plaintiff has demonstrated issues of fact as to whether Defendant's proffered legitimate reason is a pretext for unlawful discrimination. Plaintiff responds to Defendant's proffered reason saying that while she may have exhibited poor customer service at first, her performance improved after she was counseled by her immediate supervisor, Matt Johnson, within a week or two after she was transferred to the TSA position. The Plaintiff described the work environment at TA saying that the customers (truck drivers) were "mean" and "mouthy" and that, as a mechanic, it was acceptable to stand up to them and be "mouthy back." Plaintiff found it difficult to switch to the TSA position at which she was required to be polite to the same truck drivers. When discussing "losing her temper" with customers, the Plaintiff testified that there were a "few times" when she "went off"[4] with a customer before Mr. Johnson came to her, but after that meeting, she tried to seek his assistance as often as she could. Her co-worker, Bettie Harlow, testified that Plaintiff was never alone at the TSA position and that, although the first two weeks were "hell," the Plaintiff started to

---

[4]Again, the Plaintiff defines "went off" as "[r]aising my voice, you know, telling them to be patient. Hold on. I'm trying my hardest here. And I would say that kind of in a rude voice." Lambert depo at 115: 12-14, docket #48-4 at 16.

improve and did get better over time.

Defendant counters that only the perception of the decision-maker as to the decision to terminate is relevant and that Plaintiff's own testimony, and the testimony of non-managers, is insufficient to show she was qualified to perform the job. Docket #55 at 12. However, testimony by the Defendant's managers demonstrates that they relied on others' perceptions of Ms. Lambert's work performance. Mr. Johnson, Assistant General Manager, testified that he relied primarily on the input of the people Ms. Lambert worked with - Bettie Harlow and Trisha Kimble - to determine whether she was doing her job. In addition, Mr. Parks, General Manager, testified that Mr. Johnson brought him the information regarding customer service issues involving Ms. Lambert, and terminated her because "Matt [Johnson] failed to see any performance improvement on her part." Moreover, one of the Plaintiff's supervisors, Mr. Schaefer, testified that his perception at the time of her termination was that the Plaintiff "just needed more learning, more coaching." The Court finds that these managers' statements, considered together with Plaintiff's and her co-worker's statements and the fact that the decisionmaker, Mr. Parks, had no participation in Ms. Lambert's transfer to the TSA position upon the company's notice of her pregnancy, may lead a reasonable trier of fact to infer that TA did not act for the asserted reason.

Therefore, viewing the evidence in the light most favorable to the Plaintiff, the Court finds that summary judgment on the pregnancy discrimination claim is not appropriate and Defendant's motion is denied.

## III. Retaliation Claim

Defendant asserts that summary judgment is proper on Plaintiff's retaliation claim because the Plaintiff has failed to exhaust her administrative remedies by filing a charge with the Equal Employment Opportunity Commission ("EEOC") regarding the claim. The Court agrees.

Plaintiff brings her retaliation claim pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). Exhaustion of administrative remedies is a prerequisite to bringing suit under Title VII. *See Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005) ("... a plaintiff's exhaustion of his or her administrative remedies is a jurisdictional prerequisite to suit under Title VII - not merely a condition precedent to suit"). To exhaust administrative remedies, a plaintiff must file a charge of discrimination (or retaliation) with the EEOC. "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (2005). Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice for which administrative remedies must be exhausted. *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-11 (2002)).

Here, the Plaintiff alleges that "the failure to rehire Ms. Lambert in October and November, 2008, was done in retaliation for Ms. Lambert having filed the EEOC claim." Amended Complaint at ¶ 16, docket #43 at 3. However, she admits that she did not file an EEOC charge regarding her retaliation claim. Lambert depo at 187: 18-25, 188: 1, docket #48-4 at 24. The charge of discrimination the Plaintiff filed on April 2, 2008, mentions nothing about retaliatory conduct by the Defendant. *See id.*; *see also* Exh. N, docket #48-16 at 4-5. Nevertheless, Plaintiff argues that the Defendant's retaliatory action occurred on February 26, 2008, when Mr. Parks characterized her termination as "job abandonment," and that such action was sufficiently described in the Plaintiff's subsequent EEOC charge to put the EEOC on notice of her retaliation claim. Docket #54 at 10-11. However, under this new theory, the Plaintiff fails to identify any protected activity on which the

alleged retaliatory action was based; certainly, the filing of her subsequent EEOC claim may not serve as such protected activity under the Plaintiff's theory. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-69 (7th Cir. 2006) ("proof of retaliation ... presupposes that the decision-maker knew that the plaintiff engaged in a statutorily protected activity, because if an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them") (quotations and citations omitted).

The Court finds that the Plaintiff failed to exhaust her administrative remedies with respect to her retaliation claim and, thus, the Court lacks jurisdiction to hear the claim. *See Shikles*, 426 F.3d at 1317. Defendant's motion for summary judgment as to the Title VII retaliation claim is granted.

## CONCLUSION

Based on the foregoing and the entire record herein, the Court ORDERS that Defendant's Motion for Summary Judgment [filed September 15, 2009; docket #48] is **granted in part and denied in part**. The Court lacks jurisdiction to hear Plaintiff's claim for retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended; thus, the claim is **dismissed without prejudice**. Plaintiff conceded summary judgment on her claim for punitive damages under Title VII; therefore, the claim is **dismissed with prejudice**. The Court finds genuine issues of material fact exist with respect to whether the Plaintiff was terminated based upon her pregnancy; thus, Plaintiff's claim for pregnancy discrimination pursuant to Title VII will proceed to trial.

Dated at Denver, Colorado this 16th day of November, 2009.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

18